# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: September 30, 2019

```
* * * * * * * * * * * * * *
TROY DUVAL,                       *    No. 16-1456V
                                  *
         Petitioner,              *    Special Master Sanders
                                  *
v.                                *
                                  *
SECRETARY OF HEALTH               *    Decision; Severity Requirement;
AND HUMAN SERVICES,               *    Influenza ("flu") Vaccine; SIRVA Injury;
                                  *    Onset; Duration.
         Respondent.              *
* * * * * * * * * * * * * *
```

Richard Gage, Richard Gage, PC, Cheyenne, WY, for Petitioner.
Christine M. Becer, United States Department of Justice, Washington, DC, for Respondent.

## FACT DECISION[1]

On November 4, 2016, Troy Duval ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 to -34 (2012).[2] ("Vaccine Act" or "Program"). Petitioner alleged that he developed a shoulder injury as a result of an influenza ("flu") vaccine he received on November 15, 2013. Pet. 1, ECF No. 1. A fact hearing was held on October 10, 2018, to allow Petitioner to address the prolonged period from December 16, 2013 to January 27, 2016 wherein there is no evidence in Petitioner's medical record that he suffered from shoulder pain or was receiving treatment. Testimony from an additional witness was taken on February 13, 2019. For the reasons set forth below, the I find that Petitioner failed to provide preponderant evidence that he suffered a continuous shoulder injury for six months post vaccination. Therefore, this case is dismissed.

**I.    Procedural History**

---

[1] This decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to redact medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision. If, upon review, the I agree that the identified material fits within the requirements of that provision, such material will be withheld from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).


Petitioner filed his petition on November 4, 2016. Pet. at 1. In his petition, Petitioner alleged that he suffered from a shoulder injury after he received a flu vaccine on November 15, 2013. *Id.*

Petitioner submitted medical records and an affidavit in the six months following the filing of his petition. Pet'r's Exs. 1–3, ECF Nos. 12-1–12-2, 16-1. Thereafter, Petitioner submitted additional medical, physical therapy ("PT"), and vaccination records over the following six months. Pet'r's Exs. 4–8, ECF Nos. 22-1, 23-1, 26-1–26-2, 30-1. On March 19, 2018, Petitioner filed an amended petition to assert a SIRVA table injury. Am. Pet. at 1, ECF No. 36. Respondent filed his Rule 4(c) report on March 22, 2018. Resp't's Report, ECF No. 37. Respondent argued that Petitioner's claim should be dismissed because Petitioner did not prove that his injury lasted more than six months. *Id.* at 5. In support of his argument, Respondent noted a two-year gap in treatment, during which Petitioner did not complain about his shoulder injury. *Id.*

On April 11, 2018, I issued a scheduling order directing Petitioner to address the two-year gap in treatment by submitting any additional evidence that he continuously suffered from his shoulder injury during that time. ECF No. 40. Specifically, I explained that Petitioner should file, if available, "any and all evidence showing that he suffered from his injury between December 16, 2013 and January 27, 2016, including, but not limited to, receipts for medications, over-the-counter treatments, or services provided related to his injury; affidavits from co-workers or other individuals with independent recollections of Petitioner's injury; and medical records." *Id.* In May of 2018, Petitioner submitted additional affidavits from his wife, family friend, and sister-in-law. Pet'r's Exs. 9–11, ECF Nos. 41-1, 42-1, 43-1.

During a June 5, 2018 status conference, I concluded that the complete filed record was insufficient to clarify the nature of Petitioner's condition without a fact hearing. ECF No. 44. I stated that oral testimony from witnesses would be most helpful to determine the onset, severity, and duration of Petitioner's shoulder injury. *Id.* The parties filed a joint status report on July 5, 2018, wherein they requested a fact hearing. ECF No. 45.

A fact hearing was held in Milwaukee, WI on October 10, 2018. ECF No. 49. An additional proceeding was held in Washington, D.C. on February 13, 2019, to hear testimony from Petitioner's sister-in-law, who was unable to appear in Milwaukee. ECF No. 52. Following the hearings, Petitioner submitted insurance policies and pricing tiers to contextualize his two-year gap in treatment. ECF No. 56. Respondent did not request any further post-hearing submissions, and this matter is now ripe for consideration.

II. **Evidence**

   a. **Pre-Vaccination Medical History**

Petitioner's medical history does not include any evidence that he suffered from a left shoulder injury or complained of left shoulder pain prior to the vaccination at issue. *See generally* Pet'r's Ex. 8. His medical records chronicle diagnosis and treatment of multiple

disorders, including ADHD, anxiety, diabetes mellitus type 2, hyperlipidemia, and hypertension. *Id; see also* Pet'r's Ex. 1 at 2–3.

### b. Date of Vaccination Medical History

On November 15, 2013, through his employer, School Specialty, Petitioner received the flu vaccine at issue in this case in his left arm. Pet'r's Ex. 2 at 1. Petitioner stated in his affidavit that he "felt immediate pain upon receiving the injection." *Id.* During his testimony, he explained that it "hurt extremely" and "was a radiating pain through [his] shoulder." Tr. 13:14, 21.

### c. Post-Vaccination Medical History

Petitioner testified that initially, he took over-the-counter pain medication for the last two weeks of November. Tr. 15:1–5. He "thought [the pain] was something that would eventually go away and it didn't." Tr. 14:7–8. When asked if the medication helped, Petitioner responded that "[i]t got worse actually." Tr. 15:10. Petitioner spoke to his wife, a nurse practitioner, about the unusually painful vaccination the same day he received it and showed her the injection site. Tr. 64:11–12. Petitioner testified that Mrs. Duval was concerned that the shot was administered too high on his arm. Tr. 64:12–13.

Petitioner testified that after the medication did not alleviate his pain, he sought advice from his sister-in-law who is a physical therapist. She showed him exercises designed to help him "gain more mobility or more usage of [his] hand." Tr. 16:5–6. Petitioner was unable to remember if he first spoke to his sister-in-law in November or December of 2013. Tr. 15:18–16:12. Mrs. Duval stated in her affidavit that Petitioner first spoke to her sister in November. Pet'r's Ex. 9 at 1. She further clarified during her testimony that the conversation took place during their Thanksgiving holiday celebration. Tr. 75:13–76:14. Petitioner's wife testified that when her husband's shoulder still did not improve, she went to work and asked Petitioner's primary care physician, Dr. Spencer, for an orthopedic referral for him. Tr. 77:2–10.

On December 10, 2013, Petitioner went to orthopedist, Dr. Douglas Connor. Petitioner's records indicate that he complained of pain that began "the day he obtained a flu shot into that shoulder." Pet'r's Ex. 3 at 23. Petitioner continued that he felt "increased stiffness through his joint as well as pain with reaching up or out." *Id.* at 24. Petitioner's records from that visit also note "a history of right shoulder impingement syndrome treated with [PT]," but does not record "current shoulder symptoms on the right" or "numbness, tingling, or radiating symptoms down his arm." *Id.* Petitioner told Dr. Connor that his wife "felt that the shot was rather high and was concerned about intra-articular placement of the flu vaccine." *Id.* at 23. Petitioner stated that Dr. Connor agreed that the vaccination was too high. During a physical exam, Dr. Connor noted that Petitioner "had limited forward elevation" and "very limited internal and external rotation of the left shoulder due to pain symptoms." Pet'r's Ex. 3 at 23. Dr. Conner concluded that "it was very difficult to tell if it was pain or stiffness that limited [Petitioner's] motion." *Id.* Dr. Connor expressed "concern for adhesive capsulitis in a type 2 diabetic." *Id.* He did not see injury to "suggest a rotator cuff injury or labral tear." *Id.* at 25. Petitioner was given a glenohumeral joint

3

injection[3] and prescribed Lortab. *Id.* Petitioner testified that the shot "relieved the pain somewhat, but not all the way." Tr. 19:3–4.

Six days later, Petitioner again saw Dr. Connor. Pet'r's Ex. 3 at 22. Petitioner's MRI revealed "some edema along the infraspinatus consistent with his pain symptoms," but Dr. Connor remained "unclear [on] the ideology[4]." *Id.* Dr. Connor again noted that Petitioner's symptoms began "immediately after having a flu shot." *Id.* Dr. Connor was concerned about possible myositis and brachial plexus neuritis. *Id.* Petitioner was given "gentle range of motion and scapular stabilizing exercises" and told to "continue using the Lortab at night for pain relief." *Id.* He was told to follow up in 2 weeks. *Id.* During his testimony, Petitioner agreed that there was "slight improvement" but that he still experienced pains during certain activities. Tr. 20:18–19. Petitioner did not follow up with a visit, but he testified that he received a call from Dr. Connor's office approximately two weeks later. Tr. 15:16–22. There is no written record of this call, but Petitioner stated that he told the caller that "it was getting better." Tr. 57:24.

There are no additional medical records for December of 2013 or January of 2014. The medical record indicates that Petitioner next saw Dr. John Spencer, his primary care provider, on February 12, 2014. Pet'r's Ex. 3 at 67–72. Petitioner was seen for various issues unrelated to his shoulder pain, such as diabetes and hypertension. Tr. 21:16–17. He did not mention any shoulder pain or injury. Petitioner testified that his primary care physician "doesn't really do anything with the shoulder" and that they "only went over what [he] was scheduled for . . . ." Tr: 24:3–6. Dr. Spencer previously provided Petitioner with an orthopedic referral based on Mrs. Duval's request, but had not directly spoken to Petitioner about his shoulder pain. Petitioner testified that during that time, he was starting to "have this extreme pain, where [he] could hardly even sleep sometimes." Tr. 28: 20–21. Despite this continued pain, Petitioner maintained that Dr. Spencer was not the person treating his shoulder pain and he did not mention it at any of his biannual appointments. Approximately six and a half months later, Petitioner saw Dr. Spencer and again received a flu vaccine in his left arm. Pet'r's Ex. 3 at 67. He did not mention his shoulder pain or that he had any previous reaction to an influenza vaccination. When asked why he didn't mention his shoulder injury, Petitioner testified, "I said no because it wasn't a reaction to the vaccine itself. It was a reaction to the injection site, so that is why I answered no." Tr. 35:24–36:1.

Petitioner also saw Dr. Spencer twice in 2015. On April 8, 2015, Dr. Spencer saw Petitioner, and there was no mention of shoulder pain. Pet'r's Ex. 3 at 58–62. Petitioner returned to Dr. Spencer on August 29, 2015, and again did not mention any shoulder pain. *Id.* at 54–58. He also received his yearly flu vaccine during this visit and again indicated that he had had no prior adverse reaction to the flu vaccine. *Id.* Petitioner stated that he told Dr. Spencer he "needed to have referrals for an MRI on [his] shoulder, also [his] head, and x-rays.[5]" Tr. 59:6–7.

---

[3] Petitioner has type two diabetes and testified that the cortisone injections that he received caused his blood sugar to spike to dangerous levels. Although Petitioner acknowledged the shots were somewhat helpful, he limited the number he received because of this effect on his blood sugar levels.
[4] Is it unclear if Dr. Connor meant etiology.
[5] There is no recount of this conversation in the medical records.

Petitioner explained that Dr. Spencer ultimately scheduled the tests for the next year because Petitioner had to wait "until the insurance switched calendar years in January." Tr. 59:8–9. Petitioner testified that his subsequent flu vaccinations did not cause him any pain aside from "a little soreness in [his] shoulder." Tr. 63:20–22. Despite no issues with his 2014 or 2015 vaccinations, Petitioner maintained that he "was in extreme pain" throughout that year. Tr. 37:3. He testified that "the kids were now seeing the pain," and they observed "tears in [his] eyes just doing daily things like making their lunch." Tr. 37:13–14. Petitioner explained that his 2015 insurance plan "was a very end of the line like cheap insurance, and in October of 2015, [they] picked the higher insurance, knowing that [he] would have to have two MRIs done" and PT. Tr. 40:5–10. Despite Petitioner's ongoing and severe pain, he testified that "because of [his] insurance [they] had to wait until the next year, which was 2016." Tr. 40:8–9.

On January 27, 2016, Petitioner was seen by Dr. Spencer for "[s]ymptoms of frozen shoulder lasting for one and a half years." Pet'r's Ex. 1 at 26. Petitioner was asked why the record listed the symptoms occurring since mid-2014. He testified that "the history is just off by half a year, it should have been two years." Tr. 39:6–7. An MRI was completed on Petitioner's left shoulder and the results were compared to the one conducted on December 16, 2013. Dr. Spencer stated in the Result Notes, "Please let the patient . . . know that the MRI of his shoulder shows chronic changes involving the tendons of the rotator cuff but no tear, arthritic changes at the acromioclavicular joint, per the report possible somewhat worse than previous MRI in 2013 and also changes concerning for adhesive capsulitis or early frozen shoulder." Pet'r's Ex. 1 at 27. Dr. Spencer recommended "a referral back to sports medicine," and noted that Petitioner had likely not "been seen there in some time." *Id.*

Petitioner was seen by Dr. Erick Erickson, an orthopedist, with a chief complaint of "[l]eft shoulder severe adhesive capsulitis" on February 15, 2016. Pet'r's Ex. 3 at 16. The history of present illness section states that Petitioner had pain that began after a flu vaccination in late 2013. *Id.* Petitioner reported to Dr. Erickson that he received an injection in December of 2013 that "led to some significant transient relief," but "over time the pain escalated and has become severe in nature," including nighttime symptoms. *Id.* Dr. Erickson diagnosed Petitioner with fulminant adhesive capsulitis and administered a corticosteroid injection and a referral for an "aggressive therapy regiment." *Id.* at 17.

On March 9, 2016, Petitioner saw Dr. Erica Kroncke, another physician in the same practice as Dr. Erickson, and received a corticosteroid injection.[6] Pet'r's Ex. 1 at 59. Petitioner testified that the March injection "didn't relieve the pain [a]nd that's why [he] started [PT]." Tr. 44:10–11. From March through August of 2016, Petitioner went to PT twice a month with Mr. Zachary Koepke. Pet'r's Ex. 4. During a follow-up visit with Dr. Kroncke on April 27, 2016, Petitioner reported that "[o]verall, he feels improved" from the combination of the shot and the PT. Pet'r's Ex. 3 at 10. He received a second injection from Dr. Kroncke on June 29, 2016. Pet'r's Ex. 1 at 4. Petitioner's last PT record from August 17, 2016 states that he "has full pain free AROM and strength" but is "lacking IR motion to be able to scratch back." Pet'r's Ex. 4 at

---

[6] In 2016, Petitioner also received occupational therapy and a cortisone shot for "tennis elbow in [his] right arm, that was doing the overcompensating for the left arm." Tr. 49:5–7.

5

77. The record continues, that "all motions are functional" and Petitioner "will cont the HEP stretching daily and strengthening." *Id.* Finally, the record states that Petitioner had met all five of his long-term goals for therapy and no short-term goals were outlined. *Id.* at 78.

Dr. Kroncke saw Petitioner again two weeks after his last PT session on August 24, 2016. Petitioner reported to Dr. Kroncke that he was "85% of where he would like to be with his shoulder following [PT] as well as two ultrasound-guided steroid injections." Pet'r's Ex. 3 at 2. Dr. Kroncke recommended that Petitioner continue his home exercise program regularly and avoid aggravating activities. *Id.* at 3. When Petitioner returned to Dr. Spencer for a regularly scheduled examination, there was no mention of shoulder pain, and Petitioner received his yearly flu vaccination. Pet'r's Ex. 1 at 74–79.

### d. Insurance

During his testimony, I asked Petitioner how insurance coverage affected his ability to seek treatment prior to 2016. Petitioner stated, "that is something my wife would have to answer. I don't take care of the insurances at all." Tr. 61:15–17. I asked additional questions and the following testimony ensued.

> THE COURT: So if you weren't aware of the insurance issue, how did you know not to ask your doctor for an MRI?
> THE WITNESS: My wife told me that the insurance wouldn't cover it, because we already met our deductible I believe. Or something like that.
> THE COURT: So you had a conversation with your wife?
> THE WITNESS: Yes.
> THE COURT: So how did that conversation go?
> THE WITNESS: That we want to wait until the next year when we had better insurance to cover the MRIs, and not pay out of pocket.
> THE COURT: When was that conversation?
> THE WITNESS: I believe October when we had to choose our health plan.
> THE COURT: October of what year?
> THE WITNESS: 2015.
> THE COURT: So in 2014, why didn't you have that conversation with your doctor about getting the MRI?
> THE WITNESS: I don't know that.

Tr. 61:18–62:14. Petitioner testified that his wife asked Dr. Spencer for his orthopedic referral in 2013 so that the insurance would cover the costs, but she did not "actually talk [to him] about the pain issue itself." Tr. 63:4–5.

Mrs. Duval was asked about her family's insurance plans from 2013-2016. She stated that she was pregnant through the end of 2013, and the family "already had thousands in medical bills at that point." Tr. 85:6–8. Mrs. Duval then explained that in 2014, the deductible reset and "the bills were just mounting at that point." Tr. 85:9–10. As a result, in 2015, they "went to a

6

higher deductible plan then just to help, so less out of pocket every month or every paycheck for the – [her] portion of the payment." Tr. 85:19–21. Mrs. Duval testified that they changed the plans to help the family financially, but her husband "was having worsening pain" during 2015. Tr. 86:6. In 2016, they changed their benefits to "a plan that every medical bill [the insurance company] paid." Tr. 86:19–20. She stated that "it wasn't like [they] handed over money for co-pays at that time." Tr. 86:21–23. Mrs. Duval explained that the 2016 plan was different because in 2015, the insurance did not pay out until the family reached their deductible. Tr. 87:8–9. As soon as the new benefits for 2016 kicked in, Petitioner was able to see a physical therapist as recommended.

After the hearing, Petitioner filed copies of the family's insurance benefits guides for 2013-2016. Pet'r's Exs. 14–17, ECF No. 56-1–56-3.[7] All of these guides contain information for the high-deductible plan and the co-pay plan for each year, and the rates remained the same. *See id.* The high-deductible plan had a per pay period cost of $150.13 compared to $206.76 for the copay plan. Pet'r's Ex. 17 at 2–3. While the high-deductible plan saved Petitioner approximately $56.00 per month in automatic payments, his calendar year deductible is $2,400.00, or twice as much as the deductible under the copay plan. *Id.* Additionally, after the deductible is met, Petitioner is responsible for 20% of the costs for up to 40 PT visits per year under the high-deductible plan, compared to 10% responsibility under the copay plan. *Id.*

    e. **Other Witnesses**

        i. **Mrs. Duval**

Mrs. Duval also provided evidence to corroborate that Petitioner's pain began the day of his vaccination. Pet'r's Ex. 9 at 1; Tr. 74:17–22. She testified that she immediately expressed concern about the location of the injection, noting it was "beyond – above the deltoid." Tr. 75:1–2. Ms. Duval's testimony was also consistent with her husband's in describing his initial cortisone shot, conversation with her sister, and eventual treatment beginning in 2016. She confirmed that at her request, Dr. Spencer provided Petitioner with a referral to see Dr. Connor. Tr. 77:5–7.

Mrs. Duval provided additional background on her employer's general charting practices but testified that she did not ever have access to her husband's chart aside from what was requested by and released to Petitioner. Tr. 97:1–6. I asked Mrs. Duval about her concern with the location of vaccination. Tr. 108:11–12. She testified that she did not know the significance of a high vaccination site, only that it was much higher than she had been taught. Mrs. Duval stated that she did not remember exactly what could happen if a shot is administered too high, but she did remember "they will say don't go in the joint space." Tr. 97:22–25. Mrs. Duval stated that she thought this shot may have been administered inappropriately because of the nature and severity of petitioner's pain. Tr. 109:1, 16–7,

---

[7] Although Petitioner's notice of filing indicates that he includes guides for each year, 2013-2016, the documents reflect that Ex. 14 was not copied in its entirety and the year of the guide is not visible. The notice of filing accurately describes Exs. 15 and 17 but Exhibit 16 is repeated filing of the guide for the year 2014.

7

### ii. Mrs. Keuler

Mrs. Jaime Keuler, Petitioner's neighbor, also provided an affidavit and testified on behalf of Petitioner. Pet'r's Ex. 10. Ms. Keuler described in her affidavit two incidents that occurred in the spring and summer of 2015 to highlight Petitioner's ongoing pain. *See id.* She stated that during April of 2015, Petitioner showed her how to use a lawnmower but was unable to pull the cord to start it, because "his shoulder was sore and stiff." *Id.* at 1. Mrs. Keuler also described a family gathering during the late summer wherein Petitioner was unable to participate while both "families were outside playing water balloons, squirt guns, and yard games," because "he was having a lot of pain to his shoulder and preferred just to sit at that point." *Id.* at 1–2. Mrs. Keuler provided testimony consistent with her affidavit and described another incident around Easter of 2016. Tr. 115:14–125:11. She was "not completely sure of the timeline about what happened" but was told "just that there was a vaccine place on the wrong spot on the shoulder." Tr. 122:24–123:4.

### iii. Mrs. Kelly Schroeder

Petitioner's sister-in-law, Kelly Schroeder, also provided an affidavit and testimony pertaining to the advice she gave to Petitioner concerning at-home treatment for his shoulder. Pet'r's Ex. 11; Tr. 135:12–157:17. Mrs. Schroeder testified that she has a "Bachelor's degree in psychology; a Doctorate in [PT], which [she has] been practicing since 2005; and an MBA in health care administration." Tr. 137:5–8. She continued that she currently works as the Director of Rehab Services for a long-term care facility. Tr. 137:17–18. Mrs. Schroeder confirmed that she spoke to Petitioner about pain in his shoulder during the Thanksgiving holiday in 2013. Tr. 138:24. She stated that Petitioner attributed his pain directly to his vaccination at that time. Tr. 139:7–8. Mrs. Schroeder then explained that she "did a quick peek" at his shoulder and noticed that "he demonstrated signs of pain just because on kind of how he compensated with his movements and his facial expressions." Tr. 139:9–12. In her opinion, at that time, Petitioner had a "soft tissue issue." Tr. 139:16–17. Mrs. Schroeder did not believe that Petitioner had any joint restrictions at the time she saw him and told Petitioner to take ibuprofen with "some passive exercises or stretches to do just to try to move some of the swelling out of the joint." Tr. 139:23–25.

Mrs. Schroeder testified that she did not give Petitioner any formal advice during 2014, although she heard "[b]etween him and [her] sister ongoing . . . that his shoulder was still bothering him and it was getting worse." Tr. 142:6–8. In 2015, Petitioner again spoke with Mrs. Schroeder and asked her to look at his shoulder because the pain was getting so bad. Tr. 142:21–23. During this examination, Mrs. Schroeder noticed that Petitioner had indications of joint involvement consistent with frozen shoulder and restricted range of motion. Tr. 143:10–21. She explained that the shoulder joint is "where the long bone of your arm comes in and meets your scapula." Tr. 145:3–4. She continued that joints should move, but even when she applied pressure to Petitioner's, it "was stuck at this point." Tr. 144:15. Mrs. Schroeder told Petitioner that he appeared to have a joint injury and he needed to seek treatment. Tr. 145:15. On cross-examination, Mrs. Schroeder clarified that she saw Petitioner for the second time around April or May of 2015. Tr. 148:6–7. Although Mrs. Schroeder conducted brief exams for Petitioner upon request, she stated several times during her testimony that she does not like to treat family

members.  Tr. 147:–10; Tr. 148:21–22; Tr. 151:8–9.  She told Petitioner that he should seek treatment if the pain increased in 2013.  Tr. 147:21–23.  In 2015, she advised treatment as soon as possible.  Tr. 151:14–16.  When asked about the potential cause of Petitioner's pain, she stated that she "did not have enough information."  Tr. 151:8.  She did not follow-up, and noted that if asked, she "wouldn't continue to treat" and would "say you need to go somewhere else, not me."  Tr. 151:18–20.  Mrs. Schroeder continued to receive anecdotal information from her sister and Petitioner about his continuing pain when they talked to each other at family gatherings.

### III. Applicable Law

In order to state a claim under the Vaccine Act, a petitioner must have either:  (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.  §300aa-11(c)(1)(D).  "Congress included [the severity requirement] . . . 'to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine.'"  *Cloer v. Sec'y of Health and Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011) (quoting H.R. Rep. No. 100–391(I), at 699 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, –373.).  Therefore, it "is intended to restrict eligibility to the compensation program[.]" *Id.*

A petitioner cannot satisfy the six-month requirement by "merely submit[ting] a petition and an affidavit parroting the words of the statute[.]" *Black v. Sec'y of Health and Human Servs.*, 33 Fed. Cl. 546, 550 (1995), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).  Rather, a petitioner "must submit supporting documentation which reasonably demonstrates" that the injury alleged in the petition lasted more than six months from the date of vaccination. *Id.*

Under the Vaccine Act, petitioners are required to establish the facts supporting their claim by a preponderance of the evidence.  42 U.S.C. § 300aa-13(a)(1)(A).  The preponderance of the evidence standard "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The Vaccine Act expressly provides that a special master may not find that a petitioner has met his burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion."  42 U.S.C. § 300aa-13(a)(1).  Therefore, the process for finding facts in Vaccine Act cases often begins with analyzing the medical records from before and after the vaccination, as well as the vaccination records themselves.  *See* 42 U.S.C. § 300aa-11(c)(2).  Relevant case law provides that "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  "[Medical] records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium." *Id.*  Furthermore, these types of "records are . . . generally contemporaneous to the medical events" which they describe. *Id.*

9

Where testimony conflicts with contemporaneous medical records, more weight is generally accorded to the medical records. *Id.* (citing *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)); *see also Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. Appx. 952, 958 (Fed. Cir. 2011). However, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992).

### IV. Discussion

#### a. Onset

Petitioner's medical record documents that he received the vaccination at issue on November 15, 2013. Petitioner contends that immediately thereafter, he experienced shoulder pain, and his wife provided a corroborative statement. Petitioner's sister-in-law also testified that she conducted a cursory examination of Petitioner's shoulder around Thanksgiving and recommended informal treatment options, including over-the-counter pain medication and exercise. Petitioner stated that he was unable to find relief from his shoulder pain through November of 2013 and his wife intervened in December and sought a referral for her husband to obtain orthopedic treatment. The medical records establish that less than one month post vaccination, Petitioner received a cortisone injection in his shoulder to treat pain that he had consistently attributed to his vaccination. Based on Petitioner's statements to his treaters, his affidavit, and testimony, along with the statements of two witnesses and the treatment documented in his medical record, I find that Petitioner did suffer shoulder pain immediately following his vaccination.

#### b. Duration

Petitioner testified that during his follow-up visit six days after his cortisone shot, Petitioner told Dr. Connor that the pain had been somewhat relieved. Dr. Connor told Petitioner to contact the doctor's office if his pain continued. It is unclear, however, how effective this course of treatment was over time because Petitioner did not return to Dr. Connor. In fact, the doctor's office called Petitioner two weeks later to determine if he was still having pain and needed to see the doctor again. Petitioner indicated that his pain had improved and did not request additional appointments or treatments. Petitioner's failure to follow-up with Dr. Connor's office two weeks post injection or at any point after receiving a call from the office does not support his assertion that he suffered from extreme pain in the ensuing months.

Petitioner does not dispute that he did not speak to any physician about his shoulder for approximately two years following his phone call with Dr. Connor's office. He testified that this gap was due to limited insurance coverage and mounting unrelated medical costs, but Petitioner's insurance covered his visits to his primary care physician, Dr. Spencer. Petitioner

10

went to see Dr. Spencer biannually in 2014 and 2015, but Petitioner did not mention any shoulder pain during those visits.  Petitioner testified that he spoke to Dr. Spencer about his shoulder pain during his September 2015 visit, but the medical records do not record such a conversation.  The medical records do include statements from Petitioner denying that he has suffered any reaction or medical condition as a result of previous vaccinations.  Petitioner also continued his vaccinations every year, in the same arm, from the same provider, but did not notify Dr. Spencer or his staff that an administration error was responsible for his shoulder injury.  Petitioner testified that his injury was due to the injection and not the medicine, but he did not express concern at any time that the medical staff may continue their same procedures and cause future injury to Petitioner or other patients.  Dr. Spencer was Petitioner's referring physician, his primary care provider, and his only access to potential treatment for his shoulder given his financial circumstances.  Nonetheless, he said nothing to Dr. Spencer throughout two years of severe and chronic pain.  Petitioner's failure to speak with Dr. Spencer about his pain or as a precaution does not support his assertion that he suffered from extreme pain for two years.

In 2016, when Petitioner was able to seek treatment following an insurance change, he immediately reported his pain to Dr. Spencer.  Petitioner testified that he did not speak to Dr. Spencer about his pain in 2014 or 2015 because Dr. Spencer does not treat shoulders.  Therefore, it is unclear why he told Dr. Spencer about his pain in 2016.  When asked about this, Petitioner did not have an answer.  Petitioner also noted that he was not familiar with the type of insurance coverage he had at any given time, and it is unclear how he knew not to ask for a referral from Dr. Spencer in the prior years.  Petitioner's decision to speak to Dr. Spencer in 2016 beyond asking for a referral is inconsistent with his testimony that Dr. Spencer was not the appropriate medical provider to examine his shoulder.

Petitioner's wife stated that she believed the shot was administered too high and the vaccination is the cause of Petitioner's injury.  Petitioner's wife was not, however, able to explain how or why she came to this conclusion relating to causation.  Neither she nor Petitioner were knowledgeable about vaccine-induced shoulder injuries.  Both testified that they believed the pain would subside over time.  And, Mrs. Duval's pregnancy may have reasonably taken the focus off Petitioner's medical concerns.  While it is conceivable that Petitioner may have ignored slight, chronic pain for some period of time due to inadequate insurance coverage, the extended gap in treatment in this case is not adequately explained by changes in insurance and other medical priorities.  Petitioner has not provided preponderant evidence to support his assertion that he suffered sustained and extreme pain from his vaccination for several years without treatment.

Mrs. Schroeder stated that when she first spoke to Petitioner in 2014, she believed his injury to be a soft tissue issue.  She testified further that she did not speak to him again formally until Spring of 2015, but heard her sister and Petitioner mention his shoulder injury on occasion.  When Mrs. Schroeder did examine Petitioner again in 2015, she told him that he had a joint injury and should see an orthopedist.  Mrs. Schroeder's testimony provides support for two clear time periods wherein Petitioner experienced shoulder pain in late 2013 and mid-2015.  Mrs. Schroeder testified to what Petitioner told her but did not provide any personal opinion on the cause of Petitioner's pain.  She noted that the nature of Petitioner's injury had changed from

2013 to 2015, but her testimony does not shed light on whether it was the same injury that had worsened or a new injury that developed later. Her testimony does not provide preponderant evidence to support his assertion that he suffered sustained and extreme pain from his vaccination for several years without treatment.

Relying on the medical record, there is preponderant evidence to show that Petitioner suffered a shoulder injury and received treatment for it in January of 2016. Petitioner saw Dr. Spencer who noted that Petitioner had symptoms of frozen shoulder for one-and-a half years. This time frame would place the emergence of Petitioner's pain several months post vaccination. The following record from Dr. Erickson notes that Petitioner's pain began after he received the flu vaccine but waned after treatment in December of 2013. The history in Dr. Erickson's record comes from Petitioner's account and does not note the referring treater's timeframe or previous treater's assessment that Petitioner's injury has an unknown etiology. The 2016 medical record also discusses Petitioner's treatment for an earlier, right-side, shoulder issue. However, Petitioner's lack of treatment for approximately two years, the separate courses of treatment in 2013 and 2016, and repeated receipt of yearly vaccination in the same arm are inconsistent with an assertion that Petitioner suffered sustained pain from his vaccination that was severe for several years. The record aside from Petitioner's own statements and those of his wife, does not provide evidence that his injury was continuous.

## VII. Conclusion

Despite Petitioner's insurance change, he had several opportunities to consult his primary care physician for shoulder pain from December of 2013 through December 2015 and did not do so. Petitioner's report of severe shoulder pain to a medical professional in 2016 was over a full two years post vaccination and the follow-up from his orthopedist inquiring into his initial complaint. Based on the entire medical record and all other available evidence, I find that while Petitioner suffered immediate pain following his vaccination, he did not present preponderant evidence that his injury continued from that point for a period of at least six months or that his subsequent complaints in 2016 were in any way related to his 2013 vaccination. Because this six-month duration requirement must be established by a preponderance of the evidence for a claim to be successful under the Vaccine Act, this case is **DISMISSED.** The Clerk of Court is directed to enter judgment accordingly.[8]

**IT IS SO ORDERED**.

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.